WILLIAM I. BOWDITCH & another, trustees, *vs.* CHARLES F. CHICKERING & another.

Suffolk. Jan. 13. — May 9, 1885. FIELD, DEVENS, & COLBURN, JJ., absent.

In 1874, a lease of a building in a city was made for the term of ten years, the lessee agreeing to pay rent and taxes. The tax-bills were made out to the lessor, and he, in 1875 and 1876, sent them to the lessee, who paid them to the city. In 1877, the lessor agreed orally that, if the lessee would pay rent then due, and thereafter pay rent promptly, he would assume the taxes. The lessor paid the taxes for several years, ending in 1882. Two months after paying the taxes for that year, the lessor notified the lessee that, unless he would renew the lease, he would be called upon for the taxes of that year. The lessee refused to renew the lease. *Held,* that these facts constituted no defence to an action by the lessor against the lessee for the amount of the taxes of 1882.

CONTRACT, by the owners of a building in Boston against the lessees thereof, to recover the taxes assessed by the city upon the building for the year 1882. Trial in the Superior Court, before *Mason*, J., who allowed a bill of exceptions, in substance as follows:

On March 25, 1874, John J. Dixwell, the plaintiffs' testator, leased a certain building to the defendants for the term of ten years, from October 29, 1874, the lessees to pay $12,000 yearly, in equal monthly payments, "and also all the taxes, and water rates, and assessments whatsoever, whether in the nature of taxes now in being or not, except betterments, which may be payable for, or in respect of, the said premises, or any part thereof, during the said term."

Charles P. Bowditch, one of the plaintiffs, testified that the city rendered to the plaintiffs the bills for the taxes assessed on the demised premises for the years 1875 and 1876, and that the plaintiffs sent these bills to the defendants unpaid, and the defendants paid the same to the city; that the city sent to the plaintiffs the bills for the taxes assessed on the demised premises for the years 1877 to 1882, inclusive, and that the plaintiffs paid the same to the city; that the taxes for the year 1882 were paid to the city by the plaintiffs, on October 27, 1882; that the taxes for 1882 had never been repaid by the defendants, though demand was made therefor, as shown by the correspondence hereinafter referred to; that between March, 1879, and January,

1883, bills for the monthly rent, at the rate of $925 per month, were sent by the plaintiffs to the defendants, and paid by the defendants, and that between 1874 and 1878 there was some decline in the rental value of the demised premises.

Joseph E. Clapp, the defendants' bookkeeper, testified, for the defendants, that the plaintiffs sent to the defendants, in December, 1875, the bill issued by the city for the taxes on these premises for the year 1875, and in December, 1876, the bill issued by the city for the taxes for the year 1876, and that these bills were then unpaid, and that the defendants subsequently paid these bills to the city; that, on November 1, 1877, he had an interview with Charles P. Bowditch, one of the plaintiffs, in the office of the defendants. The witness further testified, that "business had been a little hard, and we had got a little behindhand in our rent, and Bowditch agreed that, if we would pay up the rent that was due, and make payments promptly hereafter, he would assume the taxes himself; that this proposal was not in consequence of any complaint made by the defendants, but voluntary on the part of Bowditch;" that on that day he, Clapp, paid to Bowditch the monthly rent due October 1, 1877, $1000, and on November 5 the monthly rent due November 1, $1000, and that thereafter the defendants received no tax-bills, and no claim was made on them for the taxes until the correspondence of December, 1882, and January, 1883.

On cross-examination, the witness testified that he did not recollect that Bowditch said anything about the length of time for which he would assume the taxes, but that the witness understood it to be for the remainder of the term; that the monthly rent was paid promptly during the remainder of the year 1877; but in 1878 the defendants fell behind in paying their rent once or twice, as much as two or three months in arrear, and on one occasion settled the rent by giving notes for the amount thereof, and that since then the rent had been paid promptly.

George H. Chickering, one of the defendants, testified that Clapp communicated to him the conversation which he had had about the taxes with Bowditch on the day that it occurred; that, in 1879, he had, with the knowledge of Bowditch, endeavored to get another tenant and rent the building, and that, at the time the following correspondence took place between the

parties, he had placed the building in the hands of a broker for that purpose, and that certain letters passed between the parties to this suit, and that after receipt of the letter dated February 20, 1879, and in consequence of the reduced rental, he gave up all endeavors to find a new tenant, and withdrew the building from the broker's hands; and that, on October 8, 1879, the defendants received from the plaintiffs a letter, and sent a reply on October 10.

On cross-examination, Chickering testified that he never had any conversation with Bowditch about a reduction of the rent, and that he did not remember that he had any talk with him about putting the warehouse into the hands of an agent, and that such a thing was possible, but that he did not recall that he ever had had such a talk, the communication being generally by correspondence. Several letters between the parties were put in evidence, as follows:

On January 29, 1879, the defendants wrote to the plaintiffs, proposing that the rent should be reduced $200 a month, and adding: "We propose that this reduction shall be $200 per month. We are reluctant to make this proposal, when we recall your consideration in assuming the price of taxes, but the necessities of the times compel us to do it."

On February 20, 1879, the plaintiffs wrote to the defendants: "We will consent to reduce your rent by the sum of seventy-five dollars per month for the present, provided the same is paid promptly on the first day of each month."

On October 8, 1879, the plaintiffs wrote to the defendants: "Some time ago we reduced your rent at your request, owing to the prevalent business depression, first, by throwing off taxes, and later, by a reduction of $900 on the cash rental. I would ask you now, whether, in view of your greatly increased business, it would not be proper to return to the original rental, or at least to $12,000 per year."

On October 10, 1879, the defendants wrote to the plaintiffs: "We were very grateful when you assumed the taxes, all the more so because it was voluntary on your part. We were grateful for the further reduction, although it was less than we thought it ought to have been. We trust you will allow us to continue our feelings of gratitude."

On December 29, 1882, the plaintiffs wrote to the defendants in regard to a renewal of the lease, and saying: "We do not desire to use undue haste in this matter, but we wish to notify you that, as, in case of your removal, it would probably be necessary to make considerable changes in the store, we shall feel obliged, in the event of our not coming to an agreement, to charge you the rental called for by your lease, from January 1, 1883, including the taxes for 1882. In the mean time, we will receive from you $925 per month, giving you a receipt on account, for such time as will afford you a reasonable opportunity to arrive at a decision."

To this letter the defendants replied, on January 10, 1883, that it was then impossible for them to decide as to the renewal of the lease.

On January 11, 1883, the plaintiffs wrote to the defendants as follows: "Yours of January 10th, in reply to ours of December 29th, is at hand. We regret that your Mr. Chickering is not inclined to consider the renewal of his lease at the present time, for reasons which we have already given. We shall be obliged, therefore, to render you hereafter bills for the rent at the rate called for by the lease, namely, one thousand dollars per month and taxes. We enclose bill for taxes of 1882, amounting to fourteen hundred and seventy-nine dollars and eighty cents, for which we will thank you to send us your check. If your lease should be extended, the payments now made will be taken into consideration."

On February 1, 1883, the defendants wrote to the plaintiffs, declining to pay the bill.

It appeared from the testimony of the defendants' witnesses, that the taxes for 1883 were paid by the plaintiffs on October 25, 1883, and that the plaintiffs demanded repayment thereof from the defendants on January 1, 1884, and the defendants thereupon repaid the amount of these taxes; and also that the defendants have paid the full monthly rental called for by the lease from February 1, 1883, inclusive.

At the close of the defendants' evidence, the judge ruled that there was no evidence to go to the jury of any facts which would constitute a defence to the action, and that the jury would not be warranted in inferring any such facts from the evidence,

and thereupon ordered a verdict for the plaintiffs for $1585.85, the amount of the taxes for 1882 and interest. The defendants alleged exceptions.

*E. W. Hutchins & H. Wheeler*, for the defendants.

*J. B. Warner*, for the plaintiffs.

C. ALLEN, J. The great reliance of the defendants is, that the payment by the plaintiffs of the taxes for 1882 is to be treated as a gift. The evidence upon which this claim is founded is substantially as follows. The witness Clapp testified that on November 1, 1877, " Bowditch agreed that, if we [the defendants] would pay up the rent that was due, and make payments promptly hereafter, he would assume the taxes himself; that this proposal was not in consequence of any complaint made by the defendants, but voluntary on the part of Bowditch; " and, on cross-examination, " that he did not recollect that Bowditch said anything about the length of time for which he would assume the taxes, but that the witness understood it to be for the remainder of the term." He also testified that thereafter the defendants received no tax bills, and no claim was made on them for the taxes until the correspondence of December, 1882, and January, 1883. It appeared that the plaintiffs paid the taxes to the city for all the years from 1877 to 1882 inclusive.

This evidence is insufficient to show a contract by the plaintiffs to pay the taxes for any certain length of time in the future, after the first year. Irrespectively of any question of consideration, the plaintiffs did not promise to pay the taxes during the remainder of the term, and the promise which was made would have been fulfilled by paying them for a single year. The understanding of the witness Clapp that the plaintiffs would assume the taxes for the remainder of the term is immaterial, and the language to which he testifies does not import any such undertaking, and there is nothing to show that Bowditch so understood it himself, or intended that the witness should so understand it. The correspondence in 1879 also goes far to show, if indeed it is not conclusive upon the point, that the parties did not consider that this agreement was a permanent one, or extended for any fixed length of time in the future. No claim was made by the defendants in their letter of October 10, 1879, that there was any such agreement. We have not,

therefore, to deal with the question of the effect of a voluntary payment made by the plaintiffs in pursuance of a distinct understanding between them and the defendants, which was applicable to that very payment. The plaintiffs did not even undertake to pay the taxes for the defendants until they should give notice to the contrary. They were under no duty or obligation to give notice when their voluntary assumption of the payment of the taxes for the defendants would cease. The taxes were laid upon the owners of the property. As between the plaintiffs and the city, the plaintiffs were bound to pay them. By the covenant of the lease, the lessees agreed to pay the taxes, not to the city, but to the lessor. It was not a covenant of indemnity, but a covenant that the lessee would pay to the lessor whatever taxes should, during the term, be assessed upon the premises. A previous payment of the tax by the plaintiffs was not a condition of their right to recover the amount from the lessees. *Wilkinson* v. *Libbey*, 1 Allen, 375. *Sargent* v. *Pray*, 117 Mass. 267. *Amory* v. *Melvin*, 112 Mass. 83. *Trinity Church* v. *Higgins*, 48 N. Y. 532. If the plaintiffs had not paid the taxes in question to the city, there would be no question of their right to recover the amount from the defendants. The agreement of the plaintiffs, whatever extent of time may be given to it, was wholly voluntary on their part, and rested on no consideration. The defendants agreed to do nothing which they were not already bound to do. The plaintiffs could not be held at law or in equity to fulfil a promise of this description. See *Weber* v. *Couch*, 134 Mass. 26; *Lathrop* v. *Page*, 129 Mass. 19; *Potter* v. *Green*, 6 Allen, 442; *Harriman* v. *Harriman*, 12 Gray, 341; *Kidder* v. *Kidder*, 33 Penn. St. 268; *In re Campbell's estate*, 7 Penn. St. 100; 1 Smith's Lead. Cas. (7th Am. ed.) 444, 464, 469, note to *Cumber* v. *Wane ;* Met. Con. 191, 192.

This question has recently undergone great discussion in England, and it has been held in the House of Lords that an agreement between a judgment debtor and creditor that, in consideration of the debtor's paying down a part of the judgment debt and costs, and on condition of his paying the rest by instalments, the creditor would not take any proceedings on the judgment, is *nudum pactum*, and does not prevent the creditor, after the whole principal of the debt and costs have been paid,

from enforcing payment of the interest on the judgment. *Foakes x. Beer*, 9 App. Cas. 605. So, also, in *Crowley* v. *Vitty*, 7 Exch. 319, where a lease stipulated for rent at 20*s.* a week, and during the continuance of the tenancy it was verbally agreed between the lessors and the lessee that the latter should hold the premises at the weekly rental of 16*s.*, which was subsequently paid, it was held that there was nothing to bind the lessors to accept the reduced rent, and that the transaction really amounted to nothing more than an indulgence on the part of the landlord, which might be put an end to at any time.

The question, therefore, comes back to this, whether by the payment of the taxes for 1882 by the plaintiffs to the city, under the circumstances stated, there was evidence of a completed gift of that amount to the defendants. There was no accounting afterwards between the parties which took any notice of this payment. No subsequent mention of it was made between them, until the plaintiffs' letter of December 29, 1882, which certainly contains no implication against their right to recover the amount. Nothing passed between the parties afterwards which could convert the payment into a gift, unless it was a gift at the time when made. The defendants took no action upon the faith of it which could raise against the plaintiffs an estoppel or an equity of which courts can take notice. It was a payment, as has been seen, which the plaintiffs were legally bound to make to the city. They had made no promise to the defendants which covered it. The defendants may well have had a hope, or even an expectation, that the plaintiffs would continue the payments for their benefit. But the trouble with their argument is, that they had no contract to that effect, and they got nothing afterwards which would amount to a mutual recognition that the payment should be considered as an executed gift to them. It may well be that a payment made in pursuance of a distinct understanding between the parties, covering the particular transaction, or even a subsequent understanding to that effect, may take effect as a gift; that it is not necessary for the money to pass through the hands of the donee; and that such a payment is the same, in legal effect, as if the money passed directly through the donee's hands. These questions we need not here specially consider. In the present

case, the evidence fails to warrant a finding that the possession or custody of the money was conferred on the defendants by the plaintiffs, actually or constructively, or that the payment was made with the intention of perfecting a gift at the time. In these particulars, the case is easily distinguishable from *Strong* v. *Bird*, L. R. 18 Eq. 315, *Yeomans* v. *Williams*, L. R. 1 Eq. 184, and *Waller* v. *Andrews*, 3 M. & W. 312, which are much relied on by the defendants.

For the reasons stated, it becomes unnecessary to consider the other questions argued by the parties. *Exceptions overruled.*